# EXHIBIT 20

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

FILED

JUN 10 10 34 AM '05

CLE...
WES...
BY _____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| Valero Refining Company-California, | ) |
| Valero Refining Company-Louisiana, | ) |
| Valero Refining Company-New Jersey, | ) |
| Valero Refining Company-New Orleans | ) |
| Valero Refining Company-Oklahoma, | ) |
| Valero Refining-Texas, L.P., | ) |
| Ultramar, Inc., TPI Petroleum, Inc. | ) |
| Colorado Refining Company and | ) |
| Diamond Shamrock Refining Company, | ) |
| L.P., and Tesoro Refining and | ) |
| Marketing Corporation, | ) |
| Defendants. | ) |

CIVIL ACTION NO.

# SA05CA0569

**RF**

## COMPLAINT

The United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), alleges:

## NATURE OF ACTION

1. This is a civil action brought against Valero Refining Company-California, Valero Refining Company-New Jersey, Valero Refining Company-Louisiana, Valero Refining Company-New Orleans, Valero Refining-Texas, L.P., Ultramar, Inc., TPI Petroleum, Inc., Colorado Refining Company and

Diamond Shamrock Refining Company, L.P. (hereinafter individually and collectively, "Valero") and Tesoro Refining and Marketing Corporation (hereinafter "Tesoro") (hereinafter collectively the "Companies" or "Defendants"), pursuant to Sections 113(b) and 211(d) of the Clean Air Act ("CAA" or the Act), 42 U.S.C. §§ 7413(b) and 7545(d), for alleged environmental violations at petroleum refineries owned and operated by the Companies and/or violations of the fuels regulation provisions of the Act.

2.  All of the Companies' refineries have been and are in violation of EPA's regulations implementing the following Clean Air Act statutory and regulatory requirements applicable to the petroleum refining industry: Part C of Title I of the Act, 42 U.S.C. § 7470-7492, Prevention of Significant Deterioration ("PSD"); Section 173 of Part D of the Act, 42 U.S.C. §§ 7503-7515,  New Source Review ("NSR"); Section 7545 of Title II of the Act, 42 U.S.C. § 7545, Regulation of Fuels; New Source Performance Standards ("NSPS"), 40 C.F.R. Part 60, Subpart J; Leak Detection and Repair ("LDAR"), 40 C.F.R. Parts 60 and 63; National Emission Standards for Hazardous Air Pollutants ("NESHAP") for Benzene, 40 C.F.R. Part 61; and the Colorado, Louisiana, New Jersey, Oklahoma, and Texas state implementation plans ("SIPs") and California regional

regulations for the Bay Area Air Quality Management District ("BAAQMD") and the South Coast Air Quality Management District ("SCAQMD") which incorporate and/or implement the above-listed federal regulations.

3.   The United States seeks an injunction ordering Defendants to comply with the above statutes and the laws and regulations promulgated thereunder, and civil penalties for Defendants' past and ongoing violations.

## JURISDICTION AND VENUE

4.   This Court has jurisdiction of the subject matter herein and over the parties consenting hereto pursuant to 28 U.S.C. § 1345 and pursuant to Sections 113, 167, and 211 of the CAA, 42 U.S.C. §§ 7413, 7545 and 7477.

5.   Venue is proper under Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), and under 28 U.S.C. § 1391(b) and (c).

## NOTICE TO STATE

6.   Notice of the commencement of this action has been given to the States of Colorado, Louisiana, New Jersey, Oklahoma and Texas, the California Air Resources Board, the Bay Area Air Quality Management District ("BAAQMD") and the South Coast Air Quality Management District ("SCAQMD") in accordance with Section 113(a)(1) of the Clean Air Act, 42

U.S.C. § 7413(a)(1), and as required by Section 113(b) of

the Clean Air Act, 42 U.S.C. § 7413(b).


## DEFENDANTS

7. Valero operates thirteen (13) petroleum refineries

in the United States for the manufacture of various

petroleum-based products, including gasoline, diesel, and

jet fuels, and other marketable petroleum by-products.

Valero's petroleum refineries subject to this Consent

Decree are located at: Ardmore, Oklahoma; Benicia,

California; Corpus Christi (East), Texas; Corpus Christi

(West), Texas; Denver, Colorado; Houston, Texas; Krotz

Springs, Louisiana; Sunray (McKee), Texas; Paulsboro, New

Jersey; St. Charles Parish, Louisiana; Texas City, Texas;

Three Rivers, Texas; and Wilmington, California

(hereinafter collectively, "Valero's Refineries").

8.   Tesoro operates the Golden Eagle Refinery in

Martinez, California for the manufacture of various

petroleum-based products, including gasoline, diesel, and

jet fuels, and other marketable petroleum by-products.

9.   The Defendants are "persons" as defined in Section

302(e) of the CAA, 42 U.S.C. §7602(e) and the implementing

federal and state regulations.

10.  The petroleum refining process at the Companies' fourteen refineries results in emissions of significant quantities of regulated air pollutants, including nitrogen oxides ("NOx"), carbon monoxide ("CO"), particulate matter ("PM"), sulfur dioxide ("SO2"), as well as volatile organic compounds ("VOCs") and hazardous air pollutants ("HAPs"), including benzene.  The primary sources of these emissions are the fluid catalytic cracking units ("FCCUs"), the fluid coking unit (at Benicia only), process heaters and boilers, the sulfur recovery plants, the wastewater treatment system, fugitive emissions from leaking components, and flares throughout the refinery.

<u>STATUTORY AND REGULATORY BACKGROUND
CLEAN AIR ACT REQUIREMENTS</u>

11.  The Clean Air Act established a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population.  Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1).

12.  <u>Prevention of Significant Deterioration</u>. - Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator of EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS" or "ambient air quality standards") for

certain criteria air pollutants.  The primary NAAQS are to be adequate to protect the public health, and the secondary NAAQS are to be adequate to protect the public welfare, from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

13.  Section 110 of the Act, 42 U.S.C. § 7410, requires each state to adopt and submit to EPA for approval a State Implementation Plan ("SIP") that provides for the attainment and maintenance of the NAAQS.

14.  Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  These designations have been approved by EPA and are located at 40 C.F.R. Part 81.  An area that meets the NAAQS for a particular pollutant is classified as an "attainment" area; one that does not is classified as a "non-attainment" area.

15.  Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration ("PSD") of air quality in those areas designated as attaining the NAAQS standards.  These requirements are designed to protect public health and

welfare, to assure that economic growth will occur in a
manner consistent with the preservation of existing clean
air resources and to assure that any decision to permit
increased air pollution is made only after careful
evaluation of all the consequences of such a decision and
after public participation in the decision-making process.
These provisions are referred to herein as the "PSD
program."

16.  Section 165(a) of the Act, 42 U.S.C. § 7475(a),
prohibits the construction and subsequent operation of a
major emitting facility in an area designated as attainment
unless a PSD permit has been issued.  Section 169(1) of the
Act, 42 U.S.C. § 7479(1), defines "major emitting facility"
as a source with the potential to emit 250 tons per year
("tpy") or more of any air pollutant.

17.  As set forth at 40 C.F.R. § 52.21(k), the PSD
program generally requires a person who wishes to construct
or modify a major emitting facility in an attainment area
to demonstrate, before construction commences, that
construction of the facility will not cause or contribute
to air pollution in violation of any ambient air quality
standard or any specified incremental amount.

18.  As set forth at 40 C.F.R. § 52.21(i), any major
emitting source in an attainment area that intends to

construct a major modification must first obtain a PSD

permit.  "Major modification" is defined at 40 C.F.R. §

52.21(b)(2)(i) as meaning any physical change in or change

in the method of operation of a major stationary source

that would result in a significant net emission increase of

any criteria pollutant subject to regulation under the Act.

"Significant" is defined at 40 C.F.R. § 52.21(b)(23)(i) in

reference to a net emissions increase or the potential of a

source to emit any of the following criteria pollutants, at

a rate of emissions that would equal or exceed any of the

following: for ozone, 40 tons per year of volatile organic

compounds ("VOC"s); for carbon monoxide ("CO"), 100 tons

per year; for nitrogen oxides ("$NO_x$"), 40 tons per year; for

sulfur dioxide ("SO2"), 100 tons per year, (hereinafter

"criteria pollutants").

19.  As set forth at 40 C.F.R. § 52.21(j), a new major

stationary source or a major modification in an attainment

area shall install and operate best available control

technology ("BACT") for each pollutant subject to

regulation under the Act that it would have the potential

to emit in significant quantities.

20.  Section 161 of the Act, 42 U.S.C. § 7471,

requires state implementation plans to contain emission

limitations and such other measures as may be necessary, as

determined under the regulations promulgated pursuant to these provisions, to prevent significant deterioration of air quality in attainment areas.

21.  A state may comply with Section 161 of the Act either by being delegated by EPA the authority to enforce the federal PSD regulations set forth at 40 C.F.R. § 52.21, or by having its own PSD regulations approved as part of its SIP by EPA, which must be at least as stringent as those set forth at 40 C.F.R. § 51.166.

22.  Part D of Title I of the Act, 42 U.S.C. §§ 7501-7515, sets forth provisions which direct States to include in their SIPs requirements to provide for reasonable progress towards attainment of the NAAQS in nonattainment areas.  Section §172(c) (5) of the Act, 42 U.S.C.§ 7502(c) (5), provides that these SIPs shall require New Source Review ("NSR") permits for the construction and operation of new or modified major stationary sources anywhere in the nonattainment area, in accordance with Section 173 of the Act, 42 U.S.C. § 7503, in order to facilitate "reasonable further progress" towards attainment of the NAAQS.

23.  Section 173 of Part D of the Act, 42 U.S.C. § 7503, requires that in order to obtain such a permit the source must, among other things: (a) obtain federally enforceable emission offsets at least as great as the new

source's emissions; (b) comply with the lowest achievable
emission rate as defined in Section 171(3) of the Act, 42
U.S.C. § 7501(3); and (c) analyze alternative sites, sizes,
production processes, and environmental control techniques
for the proposed source and demonstrate that the benefits
of the proposed source significantly outweigh the
environmental and social costs imposed as a result of its
location, construction, or modification.

24.    As set forth in 40 C.F.R. § 52.24, no major
stationary source shall be constructed or modified in any
nonattainment area as designated in 40 C.F.R. Part 81,
Subpart C ("nonattainment area") to which any SIP applies,
if the emissions from such source will cause or contribute
to concentrations of any pollutant for which a NAAQS is
exceeded in such area, unless, as of the time of
application for a permit for such construction, such plan
meets the requirements of Part D, Title I, of the Act.

25.    A state may comply with Section 172 and 173 of
the Act by having its own nonattainment new source review
regulations approved as part of its SIP by EPA, which must
be at least as stringent as those set forth at 40 C.F.R.
§ 51.165.

26.    Flaring and New Source Performance Standards. –
Section 111 of the CAA, 42 U.S.C. § 7411, requires EPA to

promulgate standards of performance for certain categories
of new air pollution sources ("New Source Performance
Standards" or "NSPS").  Pursuant to Section 111(b), 42
U.S.C. § 7411(b), EPA promulgated general regulations
applicable to all NSPS source categories.  Those general
regulations are set forth at 40 C.F.R. Part 60 Subpart A.

27.  EPA's NSPS regulations applicable to petroleum
refineries, including requirements for implementing and
utilizing good air pollution control practices at all
times, are set forth at 40 C.F.R. Part 60 Subpart J.  The
NSPS requirements establish an emission limit of 250 ppm of
SO2 from the sulfur recovery plants, which represents a
99.9% reduction of SO2.

28. Leak Detection and Repair. -  Section 112 of the
CAA, 42 U.S.C. § 7412, requires EPA to promulgate emission
standards for certain categories of sources of hazardous
air pollutants ("National Emission Standards for Hazardous
Air Pollutants" or "NESHAPs").  Pursuant to Section 112(d)
of the CAA, 42 U.S.C. § 7412(d), EPA promulgated national
emission standards for equipment leaks (fugitive emission
sources).  Those regulations are set forth at 40 C.F.R.
Parts 61 Subpart J and V, and Part 63 Subparts F (National
Emission Standards for Organic Hazardous Air Pollutants
from the Synthetic Organic Chemical Manufacturing

Industry), H (NESHAP for Equipment Leaks)and CC (NESHAP for
Petroleum Refineries) and Part 60 Subparts VV and GGG.

29.   The focus of the LDAR program is the refinery-
wide inventory of all possible leaking valves, the regular
monitoring of those valves to identify leaks, and the
repair of leaks as soon as they are identified.

30.   Benzene Waste NESHAP. - The CAA requires EPA to
establish emission standards for each "hazardous air
pollutant" ("HAP") in accordance with Section 112 of the
CAA, 42 U.S.C. § 7412.

31.   In March 1990, EPA promulgated national emission
standards applicable to benzene-containing wastewaters.
Benzene is a listed HAP and a known carcinogen.   The
benzene waste regulations are set forth at 40 C.F.R. Part
61 Subparts FF, (National Emission Standard for Benzene
Waste Operations). Benzene is a naturally-occurring
constituent of petroleum product and petroleum waste and is
highly volatile.   Benzene emissions can be detected
anywhere in a refinery where the petroleum product or waste
materials are exposed to the ambient air.

32.   Pursuant to the Benzene Waste NESHAP, refineries
are required to tabulate the total annual benzene ("TAB")
content in their wastewater.   If the TAB is over 10
megagrams, the refinery is required to elect a control

option that will require the control of all waste streams,
or control of certain select waste streams.

33.  Pursuant to Section 113(b) of the CAA, 42 U.S.C.
§7413(b), EPA may commence a civil action for injunctive
relief and civil penalties for violations of the Act, not
to exceed $25,000 per day of violation for violations of
the CAA.  Pursuant to Pub. L. 104-134 and 61 Fed. Reg.
69369, civil penalties of up to $27,500 per day per
violation may be assessed for violations occurring on or
after January 30, 1997; for violations occurring on or
after March 15, 2004, the statutory maximum penalty is
$32,500.  (69 Fed Reg 7126 (February 13, 2004)).

34.  Regulation of Fuels.  Under the authority granted
by Sections 211(c) and (k) of the Act, 42 U.S.C. §§ 7545(c)
and (k), EPA established standards at 40 C.F.R. Part 80 for
the importation, refining, sale, and distribution of
reformulated gasoline (defined in 40 C.F.R. § 80.2(ee)) and
conventional gasoline (defined in 40 C.F.R. § 80.2(ff)), as
well as requirements for sampling and testing procedures,
record keeping, and reporting with respect to such
activities.

35.  Pursuant to 40 C.F.R. § 80.78(a), during the
applicable regulatory control period (defined in 40 C.F.R.
§ 80.2(qq)), no person may manufacture for sale or

distribution, offer for sale or distribution, dispense,
supply, offer for supply, store, transport, or cause the
transportation of any gasoline represented as reformulated
gasoline and intended for sale or use in any covered area
(defined in 40 C.F.R. § 80.2(hh) and identified in 40
C.F.R. § 80.70), unless such gasoline meets the standards
specified in 40 C.F.R. § 80.41, including the standards for
annual average oxygen, olefin, Reid Vapor Pressure and E-
200.  Pursuant to 40 C.F.R. § 80.79 where gasoline
contained in any storage tank at any facility owned,
leased, operated, controlled or supervised by a refiner,
importer, oxygenate blender, carrier, distributor,
reseller, retailer or wholesale purchaser-consumer is found
in violation of 40 C.F.R. § 80.78, the refiner, importer,
oxygenate blender, and/or other persons are liable for the
violation.

36. Pursuant to 40 C.F.R. § 80.101, beginning January
1, 1995, any refiner or importer of conventional gasoline
shall meet the standards specified in 40 C.F.R. § 80.101,
including the standards for olefin, Reid Vapor Pressure,
oxygenate and E-200.

37.  Pursuant to 40 C.F.R. § 80.75 for reformulated
gasoline and 40 C.F.R. § 80.105 for conventional gasoline,

a refiner, importer or oxygenate blender shall submit reports to EPA.

38.    Pursuant to 40 C.F.R. § 80.74 for reformulated gasoline and 40 C.F.R. § 80.104 for conventional gasoline, a refiner, importer or oxygenate blender shall retain records and provide them to EPA upon request.

39.    Pursuant to 40 C.F.R. §§ 80.125 any refiner, importer or oxygenate blender subject to the requirements of 40 C.F.R. Part 80, Subpart F shall engage an independent certified public accountant or firm of such accountants to attest to the underlying documentation that forms the basis of the reports required by §§ 80.75 and 80.105.

40.    Section 211(d) of the Act, 42 U.S.C. § 7545(d), provides that any person who violates the regulations prescribed under Sections 211(c) and (k) of the Act shall be liable for a civil penalty of no more than $25,000 per day for each day of such violation, plus the value of any economic benefit or savings to the violator resulting from the violation.  A violation of a regulatory standard that applies to a multiday averaging period constitutes a separate day of violation for each and every day of the averaging period.  Pursuant to 40 C.F.R. § 19.4, and to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701,

for a violation occurring on or after January 31, 1997, the amount of the civil penalty is no more than $27,500 per day, and for a violation occurring on or after March 15, 2004, the amount of the civil penalty is no more than $32,500, plus the value of any economic benefit or savings to the violator resulting from the violation.  69 Fed Reg. 7126 (February 13, 2004).

## FIRST CLAIM FOR RELIEF
### PSD and NSR Requirements

41.  Paragraphs 1 through 25 are realleged and incorporated by reference.

42.  The Companies own and operate the 14 petroleum refineries identified in Paragraphs 7 and 8.  Petroleum refining involves the physical, thermal and chemical separation of crude oil into marketable petroleum products.

43.  EPA has conducted investigations of one or more of the Companies' petroleum refineries, which included site inspections, review of permitting history and emissions data, and analysis of other relevant information concerning the Companies' modification and operation of these facilities.  The United States alleges the following based on the results of EPA's investigation, information and belief:

44.  The Companies' petroleum refining process results
in emissions of significant quantities of criteria air
pollutants, including nitrogen oxides ("NOx"), carbon
monoxide ("CO"), particulate matter ("PM"), sulfur dioxide
("SO₂"), as well as volatile organic compounds ("VOCs") and
hazardous air pollutants ("HAPs"), including benzene.  The
primary sources of these emissions are the fluid catalytic
cracking units ("FCCUs"), the fluid coking unit ("FCU") (at
Benicia only), process heaters and boilers, and the sulfur
recovery plants ("SRPs").

45.  The Companies' facilities are "petroleum
refineries" in accordance with Section 169(1) of the CAA,
42 U.S.C. § 7479(1), which defines "major emitting
facility" for certain listed stationary sources as a source
with the potential to emit 100 TPY or more of any criteria
air pollutant.  The Companies' petroleum refineries are
major emitting facilities with the potential to emit in
excess of 100 TPY of NOx, PM, and SO₂, which are listed
criteria air pollutants.

46.  At all times relevant to this Complaint, the
following of the Companies' refineries were located in an
area that was designated as "Class II" under Section 162(b)
of the Act, 42 U.S.C. § 7472(b), and that has attained the
National Ambient Air Quality Standards for Ozone, of which

17

NOx is a precursor, SO₂, and PM under Section 107(d) of the Act, 42 U.S.C. § 7407(d).

47.  At all times relevant to this Complaint, the following of the Companies' refineries were located in an area that has been designated "non-attainment" for ozone, of which NOx is an precursor, under Section 107(d) of the Act, 42 U.S.C. § 7407(d), as defined in Section 171 of the Act, 42 U.S.C. § 7501.

48.  At all times relevant to this Complaint, and on numerous occasions since commencement of operations, the Companies have failed to fully and accurately identify the emissions from its petroleum refineries of one or more criteria pollutants.

49.  During the time period relevant to this Complaint, the Companies have modified the FCCU's, FCU, heaters and boilers, and SRPs at their respective petroleum refineries causing a significant increase in emissions of NOx, PM, and SO₂, which are defined as a "major modifications" within the meaning of 40 C.F.R. § 52.21(b)(2).

50.  Since the major modifications of its petroleum refineries, the Companies have been in violation of Section 165(a) of the CAA, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21, and the corresponding state implementation plans, by

failing to undergo PSD and NSR review, by failing to obtain

all appropriate permits, and failing to install the best

available control technology and/or the meet the lowest

achievable emission rate for the control of NOx, PM, and SO₂

emissions from all FCCUs, process heaters and boilers, and

sulfur recovery plants at which a major modification

occurred, and the FCU at Benicia.

51. Unless restrained by an Order of the Court, these

violations of the CAA and the implementing regulations will

continue.

52. As provided in 42 U.S.C. § 7413(b), the

Companies' violations, as set forth above, subject it to

injunctive relief and civil penalties of up to $25,000 per

day for each violation of the Act prior to January 31,

1997; $27,500 per day for each violation after January 30,

1997, and prior to March 15, 2004, pursuant to the Federal

Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C.

§ 2461, as amended by 31 U.S.C. § 3701; and $32,500 per day

for each violation occurring on or after March 15, 2004,

pursuant to 69 Fed. Reg. 7126 (February 13, 2004).


**SECOND CLAIM FOR RELIEF**
**New Source Performance Standards**

53. Paragraphs 1 through 11 and 26-27, are realleged and incorporated by reference.

54. EPA has conducted investigations of one or more of the Companies' petroleum refineries, which included site inspections, review of permitting history and emissions data, and analysis of other relevant information concerning the Companies' modification and operation of these facilities. The United States alleges the following based on the results of EPA's investigation, information and belief:

55. On one or more occasions, since June 13, 2000, the Companies' refinery flares and sulfur recovery plants have emitted unpermitted quantities of $SO_2$, a criteria air pollutant, under circumstances that did not represent good air pollution control practices, in violation of NSPS, 40 C.F.R. § 60.11(d).

56. On one or more occasions, since June 13, 2000, 1996, the Companies' refinery flares have been utilized for combustion of refinery fuel gas in violation of NSPS Subpart J, 40 C.F.R. §§ 60.104, et seq.

57. Unless restrained by an Order of the Court, these violations of the Act and the implementing regulations will continue.

58.  As provided in 42 U.S.C. § 7413(b), the
Companies' violations, as set forth above, subject it to
injunctive relief and civil penalties of up to $25,000 per
day for each violation of the Act prior to January 31,
1997; $27,500 per day for each violation after January 30,
1997, and prior to March 15, 2004, pursuant to the Federal
Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C.
§ 2461, as amended by 31 U.S.C. § 3701; and $32,500 per day
for each violation occurring on or after March 15, 2004,
pursuant to 69 Fed. Reg. 7126 (February 13, 2004).

## THIRD CLAIM FOR RELIEF
### Leak Detection and Repair Requirements

59.  Paragraphs 1 through 11 and 28 through 33 are
realleged and incorporated by reference.

60.  EPA has conducted investigations of one or more
of the Companies' petroleum refineries, which included site
inspections, review of permitting history and emissions
data, and analysis of other relevant information concerning
the Companies' modification and operation of these
facilities.  The United States alleges the following based
on the results of EPA's investigation, information and
belief:

61.   The Companies are required under 40 C.F.R. Part
60 Subpart GGG, to comply with standards set forth at 40
C.F.R. § 60.592, which in turn references standards set
forth at 40 C.F.R. §§ 60.482-1 to 60.482-10, and
alternative standards set forth at 40 C.F.R. §§ 60.483-1 to
60.483-2, for certain of its refinery equipment in VOC
service, constructed or modified after January 4, 1983.

62.   Pursuant to 40 C.F.R. § 60.483-2(b)(1), an owner
or operator of subject VOC valves must initially comply
with the leak detection, monitoring and repair requirements
set forth in 40 C.F.R. § 60.482-7, including the use of
Standard Method 21 to monitor for such leaks.

63.   Pursuant to 40 C.F.R. Part 61 Subpart J, the
Companies are required to comply with the requirements set
forth in 40 C.F.R. Part 61, Subpart V, for certain
specified equipment in benzene service.

64.   On one or more occasions since June 13, 2000, the
Companies failed to accurately monitor the subject VOC
valves and other components at each of its refineries as
required by Standard Method 21, to report the VOC valves
and other components that were leaking, and to repair all
leaking VOC valves and other components in a timely manner.

65.   On one or more occasions, since June 13, 2000,
the Companies failed to monitor all valves at its petroleum

refineries that were subject to the above described requirements.

66.    The Companies' acts or omissions referred to in Paragraphs 64 and 65 constitute violations of the LDAR.

67.    Unless restrained by an Order of the Court, these violations of the Act and the implementing regulations will continue.

68.    As provided in 42 U.S.C. § 7413(b), the Companies' violations, as set forth above, subject it to injunctive relief and civil penalties of up to $25,000 per day for each violation of the Act prior to January 31, 1997; $27,500 per day for each violation after January 30, 1997, and prior to March 15, 2004, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701; and $32,500 per day for each violation occurring on or after March 15, 2004, pursuant to 69 Fed. Reg. 7126 (February 13, 2004).

## FOURTH CLAIM FOR RELIEF
### Regulation of Fuels

69.    Paragraphs 1 through 11, and 34 through 40 are realleged and incorporated by reference.

70.    In violation of 40 C.F.R. § 80.78(a), Valero manufactured and sold or distributed, offered for sale or distribution, dispensed, supplied, offered for supply,

23

stored, transported, or caused the transportation of
gasoline represented as reformulated and intended for sale
or use in a covered area which failed to comply with the
annual average oxygen content standard of 2.10 weight
percent as specified in 40 C.F.R. § 80.41 on the following
occasions:

        a.    As set forth in a report to EPA submitted
November 15, 1999, Valero failed to comply with the annual
average oxygen content standard.

        b.    At its Texas City Refinery (ID# 07022) for
report year 2000, Valero failed to comply with the annual
average oxygen content standard.

        c.    At its Houston Refinery (ID# 00962) for
report year 2000, Valero failed to comply with the annual
average oxygen content standard.

    71.  In violation of 40 C.F.R. § 80.78(a), as set
forth by Valero in a report submitted to EPA on November
15, 1999, and pursuant to 40 C.F.R. § 80.79(a), on or about
October 12, 1999, Valero manufactured and sold or
distributed, offered for sale or distribution, dispensed,
supplied, offered for supply, stored, transported, or
caused the transportation of gasoline represented as
reformulated and intended for sale or use in a covered area

which failed to comply with the maximum per gallon olefin content standard of 25% as specified in 40 C.F.R. § 80.41.

72.   On each of the following occasions in violation of 40 C.F.R. §§  80.78, 80.101 and/or 80.27(a)(2) and Section 211 of the CAA, 42 U.S.C. § 7545, with respect to gasoline at a terminal or refinery, Valero manufactured, distributed, offered for sale or distribution, dispensed, supplied, offered for supply, sold, stored, transported, caused the transportation or introduced into commerce gasoline whose Reid vapor pressure exceeded the applicable standard.

a.     On or about the following dates, with respect to gasoline at the Valero (ID# 4006) Houston Refinery (ID# 00962), the Reid vapor pressure exceeded the applicable standard:

1) Batch number 157 on or about 9/1/00

2) Batch number 158 on or about 9/1/00

3) Batch number 120 on or about 8/24/01

b.     On or about November 28, 2001, with respect to gasoline at the Valero (ID# 4222) McKee Refinery (ID# 1655), the E-200 fuel property range exceeded the applicable standard.

c.    On or about the following dates, with respect to gasoline at the Valero (ID# 7058) Ultramar PADD1 facility (ID# 00001), the Reid vapor pressure exceeded the applicable standard:

1) Batch number 100004 on or about 4/30/00

2) Batch number 4000 on or about 4/30/01

73.  As provided in Section 211(d) of the Act, 42 U.S.C. § 7545(d), Valero's violations of the regulations prescribed under Sections 211(c) and (k) of the Act, as set forth above, subject it to a civil penalty of no more than $27,500 per day for each day of such violation or for a violation occurring on or after January 31, 1997, $27,500 per day for each violation, and for a violation occurring on or after March 15, 2004, $32,500 per day for each violation, plus the value of any economic benefit or savings to the violator resulting from the violation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States, respectfully requests that this Court:

1.    Order the Companies to immediately comply with
the statutory and regulatory requirements cited in this
Complaint, under the Clean Air Act;

2.    Order the Companies to take appropriate
measures to mitigate the effects of its violations;

3.  Assess civil penalties against the Companies for
up to the amounts provided in the applicable statutes; and

4.  Grant the United States such other relief as this
Court deems just and proper.


Respectfully submitted,


_____

KELLY A. JOHNSON
Acting Assistant Attorney General
Environment and Natural Resources
              Division
U.S. Department of Justice

DIANNE SHAWLEY
Senior Counsel
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-0096

Case No. 1:24-cv-02164-DDD-SBP   Document 30-9   filed 02/19/25   USDC Colorado
Case 5:05-cv-00529-DLG   Document 30   Filed 06/16/05   Page 28 of 29

06/16/05 THU 08:50 FAX 2025148395   DOJ EES-8   @003

1.    Order the Companies to immediately comply with
the statutory and regulatory requirements cited in this
Complaint, under the Clean Air Act;

2.    Order the Companies to take appropriate
measures to mitigate the effects of its violations;

3.   Assess civil penalties against the Companies for
up to the amounts provided in the applicable statutes; and

4.   Grant the United States such other relief as this
Court deems just and proper.

Respectfully submitted,

*Kelly A. Johnson*

KELLY A. JOHNSON
Acting Assistant Attorney General
Environment and Natural Resources
                  Division
U.S. Department of Justice

*Dianne Shawley*

DIANNE SHAWLEY
Senior Counsel
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-0096

JOHNNY K. SUTTON
United States Attorney

By: _____
SUSAN BIGGS
Assistant United States Attorney
Western District of Texas
601 N.W. Loop 410
Suite 600
San Antonio, TX   78216
(210) 384-7255
(210) 384-7247 fax
Texas Bar No. 02312500

OF COUNSEL:

JAMES JACKSON
U.S. Environmental Protection Agency
 Air Enforcement Division (2242A)
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20004