**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Civil Action No. 1:24-cv-02164-DDD-SBP

GREENLATINOS, 350 COLORADO, and
SIERRA CLUB,

     Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC.,

     Defendant.

---

### ORDER GRANTING MOTION TO DISMISS

---

Plaintiffs GreenLatinos, 350 Colorado, and Sierra Club are nonprofit organizations whose core priorities include environmental conservation, clean air and transportation, and wildlife protection. Dkt. 8 at 6–8. They bring this suit on behalf of their individual members against Defendant Suncor Energy (U.S.A.), Inc. for alleged violations of the Clean Air Act. Defendant has moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). *See* Dkt. 27. Because Defendant is correct that the case is barred under the Act, the motion is granted.

### BACKGROUND

Plaintiffs' Amended Complaint alleges Defendant is one of the largest polluters in Colorado. Dkt. 8 at 5. Plaintiffs claim Defendant's Suncor Refinery in Commerce City "consistently and continuously violates the air pollution limits imposed by [state and federal] regulations," affecting the surrounding environment and the health of its residents. *Id.* at 5, 8. The harms created by these pollutants, according to Plaintiffs, include some of the highest rates of asthma, cardiovascular disease, and

- 1 -

diabetes. *Id*. at 13. Ailments noted by members are headaches, stomach aches, allergies, breathing issues and mental health impacts. *Id*. at 8. Members also reported that they "alter their recreation due to pollution from Suncor," including "spending less time outside in gardens or neighborhood parks with their children and changing their running and walking routes." *Id*. According to the EPA's recent analysis of the area around the refinery, "69,570 residents live within a five-kilometer radius, with the nearest residential home less than half a mile away." *Id*. at 14. These residents make up the north Denver neighborhoods and Elyria, Swansea, Globeville, and Commerce City in Adams County. *Id*. at 13.

The Amended Complaint also contains a number of allegations regarding the refinery's specific emissions, how each constitutes violations of the Act, and the EPA's and Colorado's alleged lack of diligent prosecution of consent decrees with Defendant:

> 2. Plaintiffs have documented over 9,000 days of Suncor's violation of Clean Air Act requirements subject to this Complaint.
>
> …
>
> 6. Suncor has violated limits on the hydrogen sulfide ("H2S") content of fuel gas burned by forty separate boilers, heaters, flares, and other units at the refinery. These limits help control release of H2S, sulfur dioxide ("SO2"), and particulate matter ("PM").
>
> 7. Suncor has violated limits on the "opacity" of emissions from processing units that break down crude oil and extract sulfur from process gases. These limits help control releases of particulate matter and hazardous air pollutants.
>
> 8. Suncor has violated limits on carbon monoxide ("CO") emissions at certain boilers and crude processing units. In addition to CO, these limits also help control releases of harmful hazardous air pollutants like benzene and formaldehyde.
>
> 9. Suncor has violated limits on emissions of SO2 from a processing unit that extracts sulfur from process gases. These limits also help control releases of particulate matter and other sulfurous hazardous air pollutants.

10. Suncor has violated operational requirements for flares. These requirements are meant to control releases of many hazardous air pollutants by ensuring that flares are efficiently burning and breaking down those pollutants. These requirements also help control emissions of PM, nitrogen oxides ("NOx"), and CO.

11. Suncor has violated limits on emissions of NOx from a process heater that has been violating the requirement continuously since 2006.

…

50. In 2020 alone, the refinery emitted approximately 25 tons of hazardous air pollutants, 500 tons of CO, 650 tons of NOx, 125 tons of PM, 450 tons of volatile organic compounds ("VOCs"), and 230 tons of SO2.1.

…

79. Suncor files various periodic reports with CDPHE and/or EPA in accordance with regulatory or permit reporting requirements. These reports identify events where units at Suncor emitted pollutants that exceeded a numeric regulatory limit or otherwise deviated from permit requirements.

…

112. The Suncor Refinery emits over 25 tons of hazardous air pollutants on average every year.

…

115. The Suncor Refinery emits multiple categories of hazardous air pollutants, including (1) organic hazardous air pollutants, (2) metallic hazardous air pollutants, and (3) total reduced sulfur compound hazardous air pollutants.

…

192. [The MACT CC] establishes two operational limits that the Suncor Refinery's flares have violated: (1) flare minimum combustion zone net heating value; and (2) flare smoke visibility limits.

…

203. In addition to regulatory requirements, the Suncor Refinery is also subject to additional emissions standards and limitations imposed in two consent decrees entered into between EPA and previous owners of the West Plant and East Plant.

…

205. On April 30, 2002, EPA entered into a consent decree with Conoco Inc., the prior owner of the West Plant—No. H-01-4430 ("West Plant Consent Decree"). The West Plant Consent Decree imposes various requirements on the West Plant, three of which are relevant to this action.

…

208. The Consent Decree provision has been adopted into Suncor's Title V Permit.

…

215. On November 23, 2005, EPA entered into a consent decree with Valero Refining Company, the prior owner of the East Plant—No. SA-05-CA-0569 ("East Plant Consent Decree").

…

218. The Consent Decree provision has been adopted into Suncor's Title V Permit.

…

254. The State of Colorado has not commenced an action in court to enforce the violations alleged in this Complaint.

255. [Colorado] has taken limited enforcement action against Suncor for the alleged violations. Specifically, [Colorado] has issued three administrative compliance advisories and issued an administrative order settling certain violations with Suncor.

256. [Colorado]'s enforcement actions have not stopped Suncor's violations.

257. Neither the compliance advisories nor the administrative settlement order impact Plaintiffs' ability to enforce the violations alleged in this Complaint.

258. On July 2, 2024, EPA and [Colorado] issued a Notice of Violation to Suncor that includes some of the violations alleged in this Complaint.

259. On information and belief, as of the filing of this Complaint, EPA has not commenced an action in court to enforce the violations in the Notice of Violation.

260. Therefore, as of the filing of this Complaint, neither Colorado nor EPA has commenced or are diligently prosecuting an action in court to enforce the violations alleged in this Complaint.

…

269. Suncor has reported events where the three-hour rolling H2S concentration of fuel gas burned by its flares and fuel gas combustion devices exceeded 162 ppmv.

…

273. Suncor has reported events where the six-minute average opacity of emissions from its FCCUs exceeded 30%.

…

275. Suncor has reported events where the six-minute average opacity of emissions from its FCCUs exceeded 30% during the activities identified in CO Reg. 1.

…

277. Suncor has reported events where the six-minute average opacity of emissions from its FCCUs exceeded 20%.

…

279. Suncor has reported events where the three-hour rolling average opacity of emissions from its FCCUs exceeded 20%.

…

283. Suncor has reported events where the hourly concentration of CO in the emissions from its FCCUs exceeded 500 ppmv.

…

285. Suncor has reported events where the twenty-four-hour rolling average emissions of CO from boilers B-6 and B-8 exceeded 0.06 pounds per MMBtu.

…

289. Suncor has reported events where the SO2 concentration of emissions from the West Plant SRU incinerator (H-25) exceeded 250 ppmv over a twelve-hour period.

…

291. Suncor has reported events where the West Plant SRU incinerator (H-25) emitted more than 15.68 pounds of SO2 in an hour.

…

296. Suncor has reported events where the minimum combustion zone net heating value of its flares over a fifteen-minute period fell below 270 BTU/scf.

- 5 -

...

298. Suncor has reported events where emissions from its flares were visible for more than five minutes in a two-hour period.

## DISCUSSION

Defendant argues Plaintiffs lack standing because the Amended Complaint fails to allege facts that Plaintiffs' members have suffered an "injury fairly traceable to emissions from alleged violations of emission limits from the Refinery." Dkt. 27 at 8. Defendant also contends that Plaintiffs' claims are "barred by the Act's diligent-prosecution bar, which prohibits a would-be plaintiff from asserting claims that are being actively prosecuted by EPA or a state," *Id.* at 9. As to Plaintiffs' claim Twenty-Five in the Amended Complaint—violations of West Plant Consent Decree three-hour NOx emission limit—Defendant argues it fails to state a viable claim because the emission limit at that plant was not established until after the time period alleged by Plaintiffs and the claim was not brought within five years from when the claim first accrued. *Id.* at 26–27.

## I.     Standing

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). These constitutional limits and the corresponding doctrine of standing that gives shape to them imply that "[f]ederal courts do not possess a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Under this doctrine, a plaintiff must show he has actually suffered a concrete injury in order "to get in the federal courthouse door and obtain a judicial determination of what the governing law is;" speculative and theoretical injuries are not enough. *All. for Hippocratic*

*Med.*, 602 U.S. at 379 ("Nor do federal courts operate as a general forum for citizens to press general complaints about the way in which government goes about its business." (quotations omitted)). In other words, "[a]s Justice Scalia memorably said, Article III requires a plaintiff to first answer a basic question: 'What's it to you?'" *Id.* (quoting A. Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U.L. Rev. 881, 882 (1983)); *see also Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (quotations omitted)).

In order to make this preliminary showing and meet the "irreducible constitutional minimum of standing," a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 338 (2016) (quotations omitted). The "plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Id.* (cleaned up).

The first factor, whether a plaintiff has suffered an injury in fact, turns on whether he has alleged "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). "As a general rule . . . environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1155 (10th Cir. 2013)

(quotations omitted). An organization has standing "when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

The second factor, whether the injury is fairly traceable to the defendant's challenged action, turns on whether the plaintiff has shown a "substantial likelihood that the defendant's conduct caused the plaintiff's injury in fact." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005). A plaintiff "bear[s] the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013).

As to the third factor, redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (cleaned up). "A showing that the relief requested *might* redress the plaintiff's injuries is generally insufficient to satisfy the redressability requirement." *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012).

## A.    Legal Standards

The Tenth Circuit has recognized standing where plaintiffs suffered "adverse health effects from elevated air pollution and reduced participation in outdoor recreational activities due to [a plaintiff's] concerns about fine particulate matter pollution." *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC,* 21 F.4th 1229, 1241 (10th Cir. 2021) (cleaned up). When a plaintiff alleges that pollution from an industrial plant that allegedly compromises air quality, diminishes visibility of nearby parks and wilderness areas, and exposes residents to increased

- 8 -

health risks, he need only allege a "close geographical connection" to the polluter to show the injury is fairly traceable. *Id.* at 1245 (citing *Sierra Club v. EPA*, 964 F.3d 882, 887–89 (10th Cir. 2020) and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). This is true even where other sources may contribute to the pollution causing harm. *See Sierra Club*, 964 F.3d at 889; *see also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) ("Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern.").

## B.    Application

Taking as true all the well-pleaded allegations in the Amended Complaint and supporting documents, Plaintiffs have alleged sufficient facts to satisfy the traceability requirement of standing.[1] Plaintiffs' Amended Complaint (Dkt. 8) alleges that its members live within a five-kilometer radius of the refinery (¶ 54), suffer various harms related to air pollution

---

[1] Defendant does not challenge Plaintiffs' associational standing, which confers standing on an organization suing on behalf of its members when members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claims asserted nor the relief requested requires participation of individual members in the lawsuit. *See Laidlaw*, 528 U.S. at 180–81. On its face, Plaintiffs' Amended Complaint appears to satisfy these criteria. And associational standing is the current law of the land. Still, it's worth noting the inherent asymmetry in the doctrine of associational standing, as the party seeking redress for an alleged harm has not actually incurred the harm. *See FDA v. Alliance for Hippocratic Med.*, Nos. 23-235, 23-236, 602 U.S. —, slip op. at 5 (U.S. June 13, 2024) (Thomas, J., concurring)("[A]ssociational standing creates a mismatch: Although the association is the plaintiff in the suit, it has no injury to redress. The party who needs the remedy—the injured member—is not before the court.").

from it (headaches, stomach aches, allergies, breathing issues, asthma) (¶ 21), observe its flares and routinely smell odors consistent with emitted gases (¶ 22), and limit their outdoor recreational activities (gardening, eating, walking, running, community events) as a result (¶¶ 22–23). *See Utah Physicians*, 21 F.4th at 1245 (a plaintiff "has standing under the Act … to seek a remedy from a defendant that emits the injurious pollutant in the geographic vicinity of where the person is injured."). Declarations attached to the Amended Complaint note the specific distance members live from the refinery, including Li Mattson and Daniel Price—1.75 miles (Dkt. 30-3 ¶ 6; Dkt. 30-1 ¶ 8); Angela Garcia and Anna McDevitt—2 miles (Dkt. 30-5 ¶ 7; Dkt. 30-6 ¶ 6); Harmony Cummings— 4 miles (Dkt. 30-2 ¶ 9); Aracely Navarro and Renee Chacon—5 miles (Dkt. 30-7 ¶ 7; Dkt. 30-4 ¶6), as well as their alleged specific injuries from the refinery's emissions: allergies, shortness of breath, burning rubber smell, sight of haze, steam (Dkt. 30-1 ¶¶ 17, 20, 24); petroleum and asphalt smells that cause a slight headache, irritation of the sinuses, throat and eyes (Dkt, 30-2 ¶¶ 13, 17); a rotten-egg and metallic smell, arsenic and lead in soil, stomach issues, swollen eyes with black soot (Dkt. 30-3 ¶¶ 13, 16–17); bad soil, smell of rotten eggs, auto immune disease, severe migraines, trouble breathing, nosebleeds, throat irritation (Dkt. 30-5 ¶¶ 13, 17–18, 21); sight of flaring, distinct chemical smell, asthma, bronchitis, pneumonia, trouble breathing, lung irritation (Dkt. 30-5 ¶¶ 8–9, 11); scratchy throat, lethargy, avoid walking/running/gardening (Dkt. 30-6 ¶¶ 15, 17–18); sight of orange/gray haze, possible infertility, high blood pressure, diabetes (Dkt. 30-7 ¶¶ 12, 19–20).

That the ambient air quality near the refinery does not exceed regulatory guidelines, as Defendant argues, is immaterial to the determination of Plaintiffs' standing. *See LaFleur v. Whitman*, 300 F.3d 256, 270 (2nd Cir. 2002) (recognizing standing "even if the ambient level of SO2 remains within [National Ambient Air Quality Standards]," explaining

that "Congress has recognized that there are potentially adverse effects from air pollution at levels below the [standards]."). The same is true regarding Defendant's expert report, which states "emissions from the alleged violations have not harmed and are not harming Plaintiffs' members or anyone else." Dkt. 27 at 19. This is a merits argument masquerading as a challenge to standing, *viz.* whether Plaintiffs' allegations that they have been injured by Defendant are true. But Plaintiffs' allegations "need not prove causation with absolute scientific rigor," and need not rebut Defendant's expert findings on a motion to dismiss. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990) ('At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"). And in any event, "when plaintiffs sit squarely in the discharge zone of a polluting facility … their proximity [for purposes of establishing standing] speaks for itself." *Utah Physicians*, 21 F.4th at 1245 (citing *Env't Tex. Citizen Lobby, Inc. v. Exxon Mobil Corp.*, 968 F.3d 357, 370 (5th Cir. 2020). Plaintiffs' standing also cannot be reduced to the likelihood of health risks described in Defendant's expert report, as the injuries Plaintiffs allege also include loss of recreational and aesthetic activities that are traceable to the refinery. *See Utah Physicians*, 21 F.4th at 1245 (citing cases). Because Plaintiffs' Amended Complaint alleges sufficient facts to satisfy standing requirements, Defendant's motion to dismiss under Rule 12(b)(1) is denied. Accordingly, Plaintiffs' motion for discovery of jurisdictional facts is moot.

## I.     Diligent Prosecution

### A.     12(b)(6) Standard

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess

whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted). A court may grant a motion to dismiss when a complaint lacks the factual content to allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Santa Fe All. for Pub. Health and Safety v. City of Santa Fe, N.M.*, 993 F.3d 802, 810 (10th Cir. 2021). At this stage, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (internal quotation marks omitted). "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). So, a court can "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## B.    Application

Under the Clean Air Act, "[n]o [citizen suit] may be commenced if the [EPA] or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order." 42 U.S.C. § 7604(b)(1)(B). "Congress authorized citizens' suits to allow private citizens to act when 'the Federal, State, and local agencies fail to exercise their enforcement responsibility.'" *Clean Air Council v. Sunoco, Inc.,* No. 02–1553, 2003 WL 1785879, at *3 (D. Del. Apr. 2, 2003) (quoting S. Rep. No. 92–414 at 64

(1971)). "[D]iligence on the part of the enforcement agency is presumed," *see Friends of the Earth, Inc. v. Laidlaw Env't Servs.,* 890 F.Supp. 470, 487 (D.S.C. 1995), and "the purpose underlying the 'diligent prosecution' provision" is to ensure "that a defendant not be subjected simultane-ously to multiple suits, and potentially to conflicting court orders, to en-force the same statutory standards." *Conn. Fund for Env't v. Contract Plating Co.,* 631 F. Supp. 1291, 1293 (D. Conn. 1986). "The plaintiff in a citizens suit bears the burden of proving the state agency's prosecution is not diligent, and the agency must be given great deference to proceed in the manner it considers is in the best interest of all parties involved." *Karr*, 475 F.3d at 1198 (cleaned up). Plaintiffs have not met their bur-den.

Over twenty years before Plaintiffs filed the present suit against De-fendant for alleged violations of the Act, the EPA, Colorado, and Defend-ant's predecessor entered into two federal court-ordered consent decrees that resolved civil actions alleging either identical or substantially sim-ilar violations of the Act's emissions standards and limitations as al-leged in Plaintiffs' Amended Complaint. *Cf.* Dkt. 27-5 at 6–90 and 27-6 at 10–174 *with* Dkt. 8 at 55–77. The consent decrees required compli-ance with the Act's emissions standards, imposed injunctive relief at De-fendant's refinery, and subjected Defendant to stipulated penalties for future violations. *See* Dkt. 27-5 at 5–67; 27-6 at 10–174. In March 2020 and February 2024, Defendant and Colorado entered in two "Compli-ance Orders on Consent" that imposed additional injunctive relief and stipulated and administrative penalties for Defendant's alleged failure to comply with its earlier consent decrees and compliance advisories. *See* Dkt. 27-7; Dkt. 27-8. And in July 2024, the EPA and Colorado issued to Defendant a joint Notice of Violation alleging violations of various re-quirements of the consent decrees and other Title V and federal regula-tions. *See* Dkt. 27-9.

Taken together, the consent decrees, compliance orders, compliance advisories, and notice of violation serve as ongoing enforcement actions by the EPA and Colorado against Defendant for alleged violations of the Act. As a result, Plaintiffs' citizen suit, which consists of identical or substantially similar allegations, is barred by statute. *See Karr*, 475 F.3d at 1197 ("A federal court ought not to allow a citizens' suit to proceed merely because a prior pending state suit has not alleged as many separate violations of the Act as has the citizens' suit and therefore seeks to impose a less substantial civil penalty on the defendant.") (citing *Conn. Fund*, 631 F.Supp. at 1293); *see also Dodge v. Mirant Mid-Atlantic, LLC*, 732 F. Supp. 2d 578, 585 (D. Md. 2010) (ruling an earlier consent decree barred an Act citizen suit even though it resolved violations of a different but related standard).

Plaintiffs argue that the EPA and Colorado did not have an active enforcement case *in court* at the time it filed its suit and thus are not diligently prosecuting a civil action under 42 U.S.C. § 7604(b)(1)(B). *See* Dkt. 30 at 21 (citing *S. River Watershed All., Inc. v. Dekalb Cnty., Ga.,* 69 F.4th 809, 823 (11th Cir. 2023)). They also assert that consent decrees are final judgments that do not satisfy the "in court" requirement, and that "[a]dministrative enforcement of a pre-suit consent decree cannot qualify as diligent prosecution." *See* Dkt. 30 at 23–24 (citing *Sierra Club v. City & Cnty. of Honolulu*, No. 04-00463, 2008 WL 1968317, at \*5 (D. Haw. May 7, 2008)). I disagree.

As the Tenth Circuit has noted:

> [W]hen the EPA chooses to enforce [a federal statute] through a consent decree, failure to defer to its judgment can undermine agency strategy. If a defendant is exposed to a citizen suit whenever the EPA grants it a concession, defendants will have little incentive to negotiate consent decrees. The Supreme Court has recognized the importance of deference to the EPA's bargains.

*Karr*, 475 F.3d at 1197. An administrative action enforcing a court-ordered consent decree—as is the case here with the EPA's and Colorado's recent Compliance Orders, Compliance Advisories, and Notice of Violation—is sufficient to trigger the diligent prosecution bar. *See Grp. Against Smog and Pollution, Inc. v. Shenango, Inc.*, 810 F.3d 116, 128 (3rd Cir. 2016) ("the diligent prosecution bar will prohibit citizen suits during the actual litigation [commenced by an agency] as well as after the litigation has been terminated by a final judgment, consent decree, or consent order and agreement."). The consent decrees and the enforcement mechanisms against Defendant that followed them resolve identical or substantially similar alleged emission violations in Plaintiffs' Amended Complaint, *see supra* at 13, have resulted in stipulated and administrative penalties, *see* 27-8 at 65–67; 27-7 at 72–74, and provide ongoing monitoring and oversight of the alleged violations, *see* 27-8 at 56; 27-7 at 78-80. The 2020 Compliance Order brought renewed enforcement and imposed penalties against Defendant for alleged violations between July 2017 and December 2019; the 2023 Compliance Advisory for alleged violations between July 2021 and June 2022 (excluding the allegation related to H-2101); the 2024 Compliance Order for alleged violations between July 2019 and June 2021; the 2024 Notice of Violation (which incorporates the 2023 Compliance Advisory) for alleged violations between January 2020 and November 2023; and the 2025 Compliance Advisory for alleged violations between July 2022 and June 2023 (excluding the allegation related to H-2101). The violations alleged in the Amended Complaint date from July 2019 to May 2025 (other than the allegation related to H-2101), so virtually all of Defendant's conduct that Plaintiffs challenge is covered under the ongoing compliance orders, compliance advisories, and violation notice, and during the same period

of time.[2] Permitting Plaintiffs to prosecute a citizen suit aimed at curbing the same alleged violations would undercut the EPA's and Colorado's enforcement efforts, and is contrary to the Act's own restriction on citizen suits.

That the consent decrees at issue here are of a particular vintage does not render them irrelevant, as Plaintiffs argue. The use of consent decrees to enforce certain laws for long periods of time is instead a feature of their design—they allow states and the EPA to take action against a party in need of protracted oversight and streamlined future enforcement without the need to initiate a new lawsuit each time. When properly entered into and administered effectively, consent decrees can make diligent prosecution easier, less expensive, and more efficient.[3] Had the EPA and Colorado made no effort to enforce the consent decrees prior to Plaintiffs' lawsuit, the recourse sought here may have been appropriate. But because the consent decrees have been used actively by the state and federal governments to ensure Defendant's compliance with the Act, Plaintiffs' citizen suit is barred and must be dismissed.

---

[2] *See also* Dkt. 27-4.

[3] There are, to be sure, legitimate reasons to be concerned about the potential abuse of consent decrees. *See e.g.*, Janette L. Ferguson & Laura Granier, *Sue and Settle: Citizen Suit Settlements and Environmental Law*, 30 Nat. Resources & Env't 23, 23–24 (2015); Henry N. Butler & Nathaniel J. Harris, *Sue, Settle, and Shut Out the States: Destroying the Environmental Benefits of Cooperative Federalism*, 37 Harv. J. L. & Pub. Pol. 579 (2014); Stephen M. Johnson, *Sue and Settle: Demonizing the Environmental Citizen Suit*, 37 Seattle U. L. Rev. 891, 892–895 (2014); U.S. Department of the Interior, Order No. 3368, Promoting Transparency and Accountability in Consent Decrees and Settlement Agreements (2018). Yet they are a longstanding method of enforcing environmental laws like the Clean Air Act.

## CONCLUSION

Accordingly, it is **ORDERED** that:

Defendant's Motion to Dismiss, **Dkt. 27**, is **GRANTED** and

Plaintiffs' Motion for Discovery of Jurisdictional Facts, **Dkt. 31**, is **MOOT**.

DATED: May 23, 2025                BY THE COURT:

————————————————————
Daniel D. Domenico
United States District Judge